J-A18007-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| SOOMI AMAGASU, INVIDIVIDUALLY AND AS SPOUSE AND POWER OF ATTORNEY FOR FRANCIS AMAGASU | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| FRED BEANS FAMILY OF DEALERSHIPS, FRED BEANS FORD, INC., FRED BEANS FORD, INC. D/B/A FRED BEANS FAMILY OF DEALERSHIPS, FRED BEANS KIA OF LIMERICK, FRED BEANS MOTORS OF LIMERICK, INC., FRED BEANS MOTORS OF LIMERICK, INC. D/B/A FRED BEANS KIA OF LIMERICK, MITSUBISHI MOTORS NORTH AMERICA, INC., AND MITSUBISHI MOTORS CORPORATION | : : : : : : : : : : : : : : : : | No. 1594 EDA 2024 |
| APPEAL OF: MITSUBISHI MOTORS NORTH AMERICA, INC. | : : | |

Appeal from the Order Entered May 6, 2024
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 181102406

BEFORE: OLSON, J., DUBOW, J., and BECK, J.

MEMORANDUM BY OLSON, J.:                    **FILED DECEMBER 22, 2025**

Appellant, Mitsubishi Motors North America, Inc. ("Mitsubishi"), appeals from the May 6, 2024 judgment entered in the Court of Common Pleas of Philadelphia County following a $1,009,969,395.32 jury verdict in favor of Appellees, Francis and Soomi Amagasu. Upon careful review, we vacate the judgment entered by the trial court and remand for a new trial.

On November 11, 2017, Francis Amagasu and his 14-year-old son, Katutoshi ("Toshi"), were driver and passenger in Mr. Amagasu's 1992 Mitsubishi 3000GT on Pineville Road, in Bucks County, Pennsylvania. While driving, Mr. Amagasu attempted to pass another vehicle but ultimately lost control of his vehicle, "causing his [vehicle] to leave the road, [strike] three trees and [rollover]." Trial Court Opinion, 11/26/24, at 1. Mr. Amagasu was wearing a seat belt during the accident. Mr. Amagasu's head, however, struck the roof of the vehicle, causing him to shatter his cervical spine, an injury which rendered him quadriplegic. Toshi sustained minor injuries but was otherwise unharmed.

On November 20, 2018, Mr. Amagasu, through his wife with power of attorney, Soomi Amagasu, filed a complaint against, *inter alia*, Appellant, Mitsubishi, which they subsequently amended. In their (fourth) amended complaint, Appellees contended that the occupant restraint system (the seat belt), the vehicle's low roof configuration, and other related structures, were defective. The seat belt design, which Appellees alleged to be defective because it did not adequately restrain occupants during an accident, was the focus of Appellees' claims and the testimony at trial. More specifically, Appellees claimed that Appellant designed the Mitsubishi 3000GT's seat belt with a "rip-stitch." In this design, the lap belt folded over itself[1] and was designed to rip during a collision, adding approximately four inches of slack.

_____

[1] This was referred to by the parties at trial as a "web" or "EA" loop.

In addition, Appellees claimed that Appellant designed the Mitsubishi 3000GT with only three inches of head clearance. Appellees alleged that the seat belt's design, together with the lack of head clearance in the Mitsubishi 3000GT, constituted defective design features that posed unreasonably dangerous and unexpected risks to consumers. Appellees also argued that the Mitsubishi 3000GT lacked appropriate warnings regarding these design and safety features. Appellees claimed that the absence of necessary warnings and the defects in the Mitsubishi 3000GT's occupant restraint system and roof configuration directly and proximately caused Mr. Amagasu's catastrophic injuries.

On October 20, 2023, a jury trial commenced. Appellant was the only remaining defendant. Before trial, the parties submitted proposed jury instructions to the trial court. Importantly, the parties vigorously disputed whether the trial court was required to instruct the jury on the crashworthiness doctrine, a subset of strict liability under the Restatement (Second) of 402A. Appellant asked the trial court to instruct the jury on the burden of proof for the crashworthiness doctrine, the elements thereof, as well as the doctrine's requirements regarding proof of a safer alternative design.[2] Appellees, on the

_____

[2] Appellant asked the trial court to issue the following relevant jury instructions:

**CRASHWORTHINESS – GENERAL INSTRUCTIONS**

The Plaintiff[s] allege[] a crashworthiness defect. By "crashworthiness" I mean the plaintiff[s] do[] not allege that any

*(Footnote Continued Next Page)*

_____

defect in the vehicle cause[d] the accident itself. Instead, the plaintiff[s] allege[] that a defect enhanced injuries that Mr. Amagasu sustained in the accident, making those injuries worse than if the alleged defect did not exist.

In a crashworthiness case, the first question is whether the 1992 Mitsubishi 3000GT's seat belt was defective as designed and originally distributed. Only if you find that the design of the 1992 Mitsubishi 3000GT's seat belt was unreasonably dangerous and defective, under the definitions I have just given you, should you proceed to examine the remaining elements of crashworthiness.

**CRASHWORTHINESS – ELEMENTS**

I will now instruct you [as to] the plaintiff's burden in a crashworthiness case. In order to prove the defendant liable in a "crashworthiness" case, the plaintiff has the burden of proving:

1. That the design of the 1992 Mitsubishi 3000GT's seat belt in question was defective under the test I just provided you, rendering it unreasonably dangerous, and that at the time the 1992 Mitsubishi 3000GT's seat belt left the defendant's control, an alternative, safer design, practicable under the circumstances existed;

2. What injuries, if any, Mr. Amagasu would have sustained had the alternative, safer seat belt design been used; and

3. The extent to which Mr. Amagasu would not have suffered these injuries if the alternative seat belt design had been used. So that those additional injuries, if any, were caused by the defendant's defective seat belt system.

If considering all of the evidence you feel persuaded that these three propositions are more probably true than not, your verdict must be for plaintiff[s]. Otherwise your verdict must be for the defendant.

*(Footnote Continued Next Page)*

other hand, asked the trial court to instruct the jury in accordance with the Pennsylvania Suggested Standard Civil Jury Instruction for general strict

---

**CRASHWORTHINESS – SAFER ALTERNATIVE DESIGN PRACTICABLE UNDER THE CIRCUMSTANCES**

In determining whether the Plaintiff[s'] proposed alternative design was safer and practicable under the circumstances at the time the 1992 Mitsubishi 3000GT left [Mitsubishi's] control, as part of the Plaintiff[s'] crashworthiness burden, the Plaintiff[s] must prove that the combined risk and benefits of the product as designed by the Defendant made it unreasonably dangerous compared to the combine risks and benefits of the product incorporating the Plaintiff[s'] proposed feasible alternative design.

In determining whether the Plaintiff[s] ha[ve] proven an alternative design that was safer and practicable under the circumstances, you may consider the same risk-utility factors I provided you earlier in my instructions.

Appellant's Proposed Jury Instructions, 10/17/23, at 11-12, 18 (footnotes omitted).

liability under Section 402A,[3] the determination of a design defect,[4] failure to

warn,[5] and causation.[6]  At a subsequent charge conference conducted on

_____

[3] Appellees' proposed jury instruction stated, in relevant part, as follows.

> Plaintiffs claim that Mr. Amagasu's injuries were caused by the vehicle's occupant restraint system, distributed by Defendant Mitsubishi, which was defectively designed.
>
> Defendant Mitsubishi is liable for all harm caused by the occupant restraint system if you find that:
>
>> 1. At the time the product left Defendant Mitsubishi's control, it was defective; and
>>
>> 2. The vehicle reached the user or consumer without substantial change in the condition in which it was sold.
>
> Under the law, a distributor of a defective product is strictly liable for the injuries caused by such defect, even if the distributor has taken all possible care in the design, manufacture, distribution and sale of the product.

Appellees' Proposed Jury Instructions, 10/17/23, at 18.  The proposed language fully conformed with  Pennsylvania Suggested Standard Civil Jury Instruction 16.10.  *See* Pa.SSJI (Civ) § 16.10.

[4] Appellees' proposed jury instruction stated, in relevant part, as follows.

> Plaintiffs claim that the occupant restraint system was defective and that the defect caused Mr. Amagasu's injuries. There are two different ways the occupant restraint system may be found to be defective in its design:

> **CONSUMER EXPECTATION TEST**

*(Footnote Continued Next Page)*

_____

Plaintiffs claim that Mr. Amagasu was harmed by the occupant restraint system that was defective under the consumer expectation test.

To establish this claim under the consumer expectation test, Plaintiffs must prove all of the following:

1. That Defendant Mitsubishi distributed the vehicle's occupant restraint system; and

2. The occupant restraint system did not perform as safely as an ordinary consumer would have expected it to perform when used in an intended way or used in an unintended but reasonably foreseeable way; and

3. The occupant restraint system's defective condition was a factual cause of the harm that occurred to Mr. Amagasu.

In determining whether an occupant restraint system was defective under this test, you may consider the following factors.

1. The nature of the occupant restraint system;

2. The identity of the user;

3. The occupant restraint system's intended use;

4. The intended user of the occupant restraint system; and/or

5. Any express or implied representations by Defendant Mitsubishi.

**RISK-UTLITY TEST**

Plaintiffs also claim that the occupant restraint system was defective under the risk-utility test. Under this test, you may find the occupant restraint system defective if you determine that a reasonable person would conclude that the possibility and

*(Footnote Continued Next Page)*

seriousness of the harm caused by the occupant restraint system outweigh the burden or costs of taking precautions.

To establish this claim under the risk-utility test, Plaintiffs must prove the following:

1. That Defendant Mitsubishi distributed the vehicle's occupant restraint system;

2. A reasonable person would conclude that the possibility and seriousness of harm outweighed the burden or cost of making the occupant restraint system safe; and

3. The occupant restraint system's defective condition was a factual cause of the harm that occurred to Mr. Amagasu.

To decide whether the occupant restraint system is defective under this test, you may consider the following factors:

1. The seriousness of the potential harm resulting from the use of the occupant restraint system;

2. The likelihood that the harm would occur;

3. The feasibility of an alternative safer design at the time of the manufacture or sale of the occupant restraint system;

4. The cost of an alternative design; and/or

5. The disadvantages of an alternative design.

Appellees' Proposed Jury Instructions, 10/17/23, at 19-20. The proposed language fully conformed with Pennsylvania Suggested Standard Civil Jury Instruction 16.20. *See* Pa.SSJI (Civ) § 16.20.

[5] Appellees' proposed jury instruction stated, in relevant part, as follows.

Even a perfectly made and designed product may be defective if not accompanied by proper warnings and instructions concerning

*(Footnote Continued Next Page)*

October 27, 2023, Appellant objected to the Appellees proposed jury instructions, stating:

> We [are] objecting to the content and proposing that in lieu of those instructions, [the trial court issue Appellant's] proposed instructions [relating to the crashworthiness doctrine].
>
> And the primary reason for our objection is that none of these instructions on strict liability contain the crashworthiness elements that are part of [Appellees'] case that they must prove in this crashworthiness case.
>
> Pennsylvania follows the [R]estatement ([S]econd) 402A. And under the restatement . . . the standard is one who sells any

_____

> its use. A supplier must give the user or consumer any warnings and instructions of the possible risks of using the product that may be required, or that are created by the inherent limitations in the safety of such use. If you find that such warnings or instructions were not given, Defendant Mitsubishi is liable for all harm caused to the Plaintiffs by the failure to warn.

Appellees' Proposed Jury Instructions, 10/17/23, at 21. The proposed language fully conformed with Pennsylvania Suggested Standard Civil Jury Instruction 16.30. *See* Pa.SSJI (Civ) § 16.30.

[6] Appellees' proposed jury instruction stated, in relevant part, as follows.

> If you find that the occupant restraint system was defective, Defendant Mitsubishi is liable for all harm caused to Plaintiffs by such defective condition. A defective condition is the factual cause of harm if the harm would not have occurred absent the defect. In order for Plaintiffs to recover in this case, Defendant Mitsubishi's defective product must have been a factual cause of the harm.

Appellees' Proposed Jury Instructions, 10/17/23, at 23. At the time of trial, the proposed language fully conformed with Pennsylvania Suggested Standard Civil Jury Instruction 16.70. In 2024, Pa.SSJI 16.70 was renumbered and its language altered. *See* Pa.SSJI (Civ) § 16.50.

product in a defective condition [that is] unreasonably dangerous to the user, consumer, or his property is subject to liability for physical harm thereby caused to the ultimate user or consumer or to his property if certain elements are met.

And so one thing that is missing from the strict liability instruction is an instruction on the unreasonably dangerous requirement as set forth in Section 402A.

And then the remainder of the instructions fail to include the crashworthiness instructions. And a crashworthiness claim is a subset of a product liability claim under Section 402A of the [R]estatement ([S]econd).

\*\*\*

[A] crashworthiness claim requires proof of three elements. First, the plaintiff must prove that the design of the vehicle was defective and that at the time of the design, an alternative, safer and practicable design existed that could have been incorporated instead.

Second, the plaintiff must identify those injuries he would have received if the alternative design instead had been used.

And third, the plaintiff must demonstrate what injuries were attributable to the defective design.

And so those are the three elements that we believe the jury needs to be charged on under the case law in Pennsylvania[.] And [the aforementioned elements] . . . need to be included on the verdict sheet [as well].

N.T. Trial, 10/27/23 (Morning Session), at 82-84.

The trial court declined to instruct the jury on the crashworthiness doctrine. Instead, the trial court issued the following instruction regarding Appellees' strict liability claim.

[Appellees] claim that Mr. Amagasu's injuries were caused by the vehicle's occupant restraint system, distributed by [Appellant,]

- 10 -

which was defectively designed. [Appellant] is liable for all the harm caused by the occupant restraint system if you find that, one, at the time the product left [Appellant's] control, it was defective. And two, the occupant restraint system reached the user or consumer without substantial change in condition in which it is sold.

Under the law, a distributor of a defective product is strictly liable for the injuries caused by such defect, even if the distributor has taken all possible care in the design, manufacture, distribution, and sale of the product.

[Appellees] claim that the occupant restraint system was defective and that the defect caused Mr. Amagasu's injuries. There are two different ways the occupant restraint system may be found to be defective in its design. Consumer expectation test. [Appellees] claim that Mr. Amagasu was harmed by the occupant restraint system that was defective under the consumer expectation test. To establish this claim under the consumer expectation test, [Appellees] must prove all of the following: One, that [Appellant] distributed the vehicle's occupant restraint system. And two, the occupant restraint system did not perform as safely as an ordinary consumer would have expected it to perform when used in an intended way or used in an unintended but reasonably foreseeable way. And three, the occupant restraint system's defective condition was a factual cause of the harm that occurred to Mr. Amagasu.

In determining whether an occupant restraint system was defective under this test, you may consider the following factors: One, [. . .]

The nature of the occupant restraint system. Two, the identity of the user. Three, the occupant restraint system's intended use. Four, the intended user of the occupant restraint system, and/or any express or implied representations by [Appellant].

[Appellees] also claim that the occupant restraint system was defective under the risk-utility test. Under this test, you may find the occupant restraint system defective if you determine that a reasonable person would conclude that the possibility and

seriousness of the harm caused by the occupant restraint system outweighs the burden of costs of taking precautions.

To establish this claim under the risk-utility test, [Appellees] must prove the following: That [Appellant] distributed the vehicle's occupant restraint system. A reasonable person would conclude that the possibility and seriousness of harm outweighed the burden or cost of making the occupant restraint system safe. And the occupant restraint system's defective condition was a factual cause of harm that occurred to Mr. Amagasu.

To decide whether the occupant restraint system is defective under this test, you may consider the following factors: The seriousness of the potential harm resulting from use of the occupant restraint system, the likelihood that the harm would occur, the feasibility of an alternative safer design at the time of the manufacture or sale of the occupant restraint system, the cost of an alternative design, and/or disadvantages of an alternative design.

Even if perfectly made and designed a product may be defective if not accompanied by proper warnings and instructions concerning its use. A supplier must give the user or consumer any warnings and instructions of the possible risks of using the product that may be required, or that are created by the inherent limitations in the safety of such use. If you find that such warnings or instructions were not given, [Appellant] is liable for all harm caused by the failure to warn.

If you find instead that there were warnings or instructions required to make this product non-defective which were not provided by [Appellant], then you must decide whether the failure by [Appellant] was a factual cause of harm to Mr. Amagasu. The question, in other words, is whether Mr. Amagasu would have been harmed if the needed warning had been provided. If you find that Mr. Amagasu would have acted to avoid the underlying hazard if such a warning had been provided, then you should find on this issue in favor of [Appellees]. Otherwise, you should find for [Appellant].

> If you find that the occupant restraint system was defective, [Appellant] is liable for all harm caused to [Appellees] by such defective condition. A defective condition is the factual cause of harm if the harm would not have occurred absent the defect. In order for [Appellees] to recover in this case, [Appellant's] defective product must have been a factual cause of harm.
>
> [Appellant] is presumed to have known at all times the facts that have been revealed about the harmful characteristics or consequences of the occupant restraint system's design, even if [Appellant] did not know those facts. If you find that it would not be reasonable for [Appellant] with such presumed knowledge, to have put the product on the market without changing the design, then the occupant restraint system is defective.

N.T. Trial, 10/27/23 (Afternoon Session), at 89-94. Hence, the trial court instructed the jury in accordance with the Pennsylvania Suggested Standard Civil Jury Instructions 16.10 (General Rule of Strict Liability), 16.20 (Determintaion of Design Defect), 16.30 (Duty to Warn) and 16.70 (Factual Cause) (as explained in a prior footnote, currently 16.50 (Factual Cause). Thereafter, Appellant's counsel renewed its objection to the trial court's jury instructions. *See id.* at 104-105.

On October 30, 2023, the jury returned a verdict for Appellees. In particular, the jury determined that (1) the occupant restraint system was defective under "either" the consumer expectation or risk-utility standard; (2) there was an "alternative driver seat belt system design, safer and practicable under the circumstances that would have prevented or reduced any of the injuries [Mr.] Amagasu sustained;" (3) the occupant restraint system lacked proper warnings and instructions concerning its use; and (4) the defects in

- 13 -

the occupant restraint system was the factual cause of Mr. Amagasu's injuries. Verdict Sheet, 10/30/23, at 1-2. The jury awarded Appellees $156,488,384.01 in compensatory damages, including for past medical expenses ($925,477.01), future medical expenses ($12,581,723.00), future loss of earning capacity ($2,273,320.00), past non-economic damages ($20,000,000.00) and future non-economic damages ($120,000,000.00). The jury also awarded Mrs. Amagasu $20,000,000.00 for loss of consortium. Thereafter, the matter proceeded to a jury trial on the issue of punitive damages. Appellees did not present any evidence. Ultimately, however, the jury awarded Appellees $800,000,000.00 in punitive damages.

Appellant filed a post-trial motion on December 7, 2023, seeking judgment notwithstanding the verdict ("JNOV"), a new trial and remittitur. The trial court convened a hearing on Appellant's post-trial motion on April 2, 2024. On April 29, 2024, the trial court denied Appellant's post-trial motion. That same day, the trial court granted Appellees' motion for delay of damages. On May 14, 2024, judgment was entered, totaling $1,009,969,395.32. This timely appeal followed.

Appellant raises the following issues for our consideration:

1. Whether a new trial is required because the trial court erred by failing to instruct on crashworthiness?

2. Whether JNOV is required on the design and warning-defect claims under the crashworthiness or traditional strict liability theory because [Appellees] failed to introduce evidence sufficient to prove essential elements of either claim?

- 14 -

3. Whether JNOV on punitive damages is required because [Appellees] failed to prove [that Appellant] engaged in outrageous conduct with an evil motive or reckless indifference?

4. Whether a new trial on punitive damages is required because the trial court erred by failing to instruct the jury that [Appellant's] undisputed compliance with the Federal Motor Vehicle Safety Standards and industry standards and customs was relevant to punitive damages, and because the jury was inflamed by [Appellees'] improper closing argument and acted with passion and prejudice?

5. Whether the trial court abused its discretion in failing to substantially remit the grossly excessive awards of $177 million in compensatory damages and $800 million in punitive damages?

Appellant's Brief at 9-10.[7]

In its first issue, Appellant argues that the trial court abused its discretion by failing to issue a jury instruction on the crashworthiness doctrine and, instead, "allow[ing] the jury to hold [Appellant] liable . . . based on inapplicable traditional strict liability principles." Appellant's Brief at 25. Appellant maintains that the evidence presented at trial supported its request

_____

[7] As will be discussed *infra*, our disposition is based upon Appellant's first claim of error. We therefore need not address Appellant's remaining claims on appeal. We note that, in vacating the instant judgment and remanding for a new trial, we necessarily vacate the jury's award of compensatory and punitive damages. *See Berg v. Nationwide Mut. Ins. Co., Inc.*, 189 A.3d 1030, 1061 (Pa. Super. 2018) (vacating the trial court's judgment and remanding for the entry of judgment in the appellant's favor and, as such, declining to address the appellant's claim with respect to, *inter alia*, the trial court's award of $18 million dollars in punitive damages); *see also Hutchinson v. Penske Truck Leasing Co.*, 876 A.2d 978, 987-999 (Pa. Super. 2005) (remanding the matter for a new trial on liability and damages based upon the trial court's improper evidentiary ruling and, as such, declining to address the appellant's allegation that the trial court erred in vacating the jury's award of punitive damages).

for a jury instruction on the crashworthiness doctrine. Appellant points to the fact that neither party disputed that the alleged defects in the Mitsubishi 3000GT's design, *i.e.*, the occupant restraint system and roof configuration, caused Mr. Amagasu's accident. In addition, Appellant cites to the parties' expert testimonies which disputed various elements of the crashworthiness doctrine, namely, the required proof of a safer alternative design, and whether the alleged safer alternative design would have prevented Mr. Amagasu's quadriplegia. Based upon all the foregoing, Appellant argues that the trial court abused its discretion in electing to give "only a 'traditional Section 402A strict products liability' instruction." *Id.* at 29 (citation omitted). This error, per Appellant, mandates a new trial. We agree.

Our Supreme Court stated:

"In examining jury instructions, our standard of review is limited to determining whether the trial court committed a clear abuse of discretion or error of law controlling the outcome of the case." Since this review involves a question of law, our review is plenary. . . . [O]ur review is guided by the tenet that trial courts have "latitude and discretion in phrasing instructions and are free to use their own expressions **so long as the law is clearly and accurately presented to the jury**."

*Polett v. Pub. Commc'ns, Inc.*, 126 A.3d 895, 930 (Pa. 2015) (internal citations omitted) (emphasis added).

"In charging the jury, the trial court's objective is 'to explain to the jury how it should approach its task and the factors it should consider in reaching its verdict.'" *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 408 (Pa. 2014)

(citation omitted). "When determining whether a trial court erred by making an inadequate or insufficient instruction to the jury, 'we must examine the charge in its entirety against the backdrop of the evidence to determine whether error was committed.'" *Colville v. Crown Equipment Corp.*, 809 A.2d 916, 921 (Pa. Super. 2002) (citation omitted). "Where evidence supports a party-requested instruction on a theory or defense, a charge on the theory or defense is warranted." *Tincher*, 104 A.3d at 408 (citation omitted). "An error will be found if 'the jury charge in its entirety was unclear, inadequate, or tended to mislead or confuse the jury.'" *Colville*, 809 A.2d at 921 (citation omitted).

This Court recently explained a typical strict liability claim, brought pursuant to the Restatement (Second) of Torts, as follows.

> A strict liability claim pursuant to [Section] 402A of the Restatement (Second) of Torts, allows recovery where a product in a defective condition unreasonably dangerous to the user or consumer causes harm to the plaintiff. There are three different types of defective conditions that can give rise to a strict liability claim: design defect, manufacturing defect, and failure-to-warn defect. For all three theories of liability, the plaintiff must prove that the product's defect caused harm.
>
> ***
>
> [To prove a design defect, a plaintiff may pursue either] the consumer expectations and risk-utility paradigms . . . in the alternative. [*Tincher*, 104 A.3d at 335. The Court explained each theory as follows]:
>
> To determine whether a product is defective under the risk-utility test, the court must assess the following non-exclusive factors:

the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.

The consumer expectations test, on the other hand, examines the nature of the product, the identity of the user, the product's intended use and intended user, and any express or implied representations by a manufacturer or other seller.

[In addition, a plaintiff may allege s]eparately [that] a product [is] defective if a plaintiff establishes that a warning of a particular danger was either inadequate or altogether lacking, and that this deficiency in warning made the product unreasonably dangerous. For the plaintiff in a failure-to-warn claim to establish the second element, causation, the plaintiff must demonstrate that the user of the product would have avoided the risk had he or she been warned of it by the seller.

*L.T. by & Through Copenhaver v. Kubota Mfg. of Am. Corp.*, 332 A.3d 47, 58-59 (Pa. Super. 2025) (quotations marks and most internal citations omitted).

There is, however, a "subset of a products liability action pursuant to Section 402A [that] usually arises in the context of a vehicular accident" known as the crashworthiness doctrine. *Colville*, 809 A.2d at 922. The crashworthiness doctrine was officially recognized by this Court in the seminal case *Kupetz v. Deere & Co.*, 644 A.2d 1213, 1219 (Pa. Super. 1994). The *Kupetz* Court explained the crashworthiness doctrine as follows:

The crashworthiness doctrine is merely a subset of a products liability action pursuant to Section 402A and usually arises in the

context of a vehicular accident. The crashworthiness doctrine provides that a manufacturer/seller is liable in situations in which the defect did not cause the accident or initial impact, but rather [is alleged to have] increased the severity of the injury over that which would have occurred absent the design defect.

The term crashworthiness means the protection that a motor vehicle affords its passenger against personal injury or death as a result of a motor vehicle accident.

\*\*\*

The effect of the crashworthiness doctrine is that a manufacturer has a legal duty to design and manufacture its product to be reasonably crashworthy. In terms of strict product liability, this means that a manufacturer has to include accidents among the "intended" uses of its product. A manufacturer who fails to fulfill this legal duty will be liable to the passenger of a car whose injuries are increased due to the design defect in the automobile. Liability will attach even though the defect in manufacture or design did not cause the initial accident or impact.

In order to prevail on a crashworthiness theory in a products liability action under Section 402A, a plaintiff must demonstrate 1) that the design of the vehicle was defective and that when the design was made, an alternative, safer design practicable under the circumstances existed; 2) what injuries, if any, would have resulted to the plaintiff had the alternative, safer design, in fact, been used; and 3) some method of establishing the extent of plaintiff's enhanced injuries attributable to the defective design.

*Id.* at 1218 (internal citations omitted) (formatting altered).

It is settled law that the "crashworthiness doctrine 'imposes on the plaintiff more rigorous proof requirements than the typical Section 402A claim.'" *Colville*, 809 A.2d at 927, *citing* ***Barris v. Bob's Drag Chutes & Safety Equip., Inc.***, 685 F.2d 94, 99 (3d Cir. 1982) (explaining that "[t]he crashworthiness . . . doctrine is a variation of strict liability theory, which

- 19 -

imposes on the plaintiff more rigorous proof requirements than a typical [S]ection 402A action."). A typical Section 402A claim "requires, in substance, only **two** elements of requisite proof: the need to prove that the product was defective, and the need to prove that the defect was a proximate cause of the plaintiff's injuries." ***Dorsett v. American Isuzu Motors, Inc.***, 805 F.Supp 1212, 1218 (E.D. Pa. 1992) (citation omitted) (emphasis added). In contrast, to recover under the crashworthiness doctrine, a plaintiff bears three separate and daunting elements of proof.

Initially, a plaintiff seeking recovery under the crashworthiness doctrine must prove that the subject vehicle's design was defective. ***See Raskin v. Ford Motor Co.***, 837 A.2d 518, 523 (Pa. Super. 2001) ("A defect is merely one element of the crashworthiness doctrine."). To prove the subject vehicle's defective design, a plaintiff may employ either, or in the alternative, the aforementioned risk-utility, consumer expectations, and/or failure to warn paradigms. ***See Davis v. Volkswagen Group of America, Inc.***, 2019 WL 3252054 *1, *12 (Pa. Super. 2019) (non-precedential decision)[8] (explaining that, in a crashworthiness case, the plaintiff attempted to prove that the vehicle's design was defective under the consumer expectation test and the defendant presented testimony that the vehicle's design was not defective under the risk-utility test); ***see also Tincher***, 104 A.3d at 427 (holding that a plaintiff may choose to pursue recovery at trial under either the consumer

---

[8] ***See*** Pa.R.A.P. 126(b) (unpublished, non-precedential memorandum decisions filed after May 1, 2019 may be cited for their persuasive value).

expectations or risk-utility tests, together or in the alternative, "if the evidence so warrants.").

In addition a plaintiff must establish that, at the time the alleged defective design was made, there existed a safer design practicable under the circumstances. *See Daddona v. Thind*, 891 A.2d 786, 797 (Pa. Commw. 2006) (explaining that crashworthiness plaintiffs introduced evidence of "an alternative, safer design that consisted of a three-point seat belt for the operator's seat[] and padding for the front-end loader's rollover protection system[] where they claimed [the plaintiff] struck his head."). Evidence of safer alternative design features is not specifically required in a typical Section 402A case. In fact, in a recent opinion, our Supreme Court rejected a party's request to mandate proof of a safer alternative design when seeking recovery in a conventional Section 402A action. *See Tincher*, 104 A.3d at 408. More specifically, the Supreme Court found that the "burden of proof in terms of evidence (**alternative design**)" was "problematic" in a typical Section 402A case because it could "prospectively limit[] the applicability of the cause of action to certain products as to which that sort of evidence is available." *Id.* (emphasis added). Accordingly, while proof of a safer alternative design is mandated in a crashworthiness case, it is **not** ordinarily required in a traditional Section 402A action.

Thereafter, a plaintiff must present detailed evidence explaining his or her injuries. In particular, a plaintiff is required to distinguish between those injuries he or she would have sustained absent any defect in the subject

vehicle, *i.e.*, his or her "non-compensable injury," and the "enhanced and compensable harm" he or she sustained as a result of the defect in the subject vehicle. ***Pennsylvania Dept. of General Services v. U.S. Mineral Products Co.***, 898 A.2d 590, 601 (Pa. 2006) (explaining that the "crashworthiness doctrine" is a "discrete facet of product liability jurisprudence" because it has "particularized elements requiring the fact finder to distinguish non-compensable injury (namely, that which would have occurred in a vehicular accident in the absence of any product defect) from the enhanced and compensable harm resulting from the product defect.").

Under the crashworthiness doctrine, the law adopts a trade off that calls upon a plaintiff to shoulder a heightened burden of proof in exchange for expanding the scope of strict liability to defects that did not cause the underlying accident. ***See Kupetz***, 644 A.2d at 1218 ("The crashworthiness doctrine provides that a manufacturer/seller is liable in 'situations in which the defect did not cause the accident or initial impact, but rather increased the severity of the injury over that which would have occurred absent the design defect.'") (citation omitted). To prevail in a crashworthiness case, a plaintiff must not only demonstrate that the subject vehicle's design was defective, but a plaintiff is also required to prove that, at the time the subject vehicle was manufactured, a safer alternative design existed. ***Id.*** In addition, a plaintiff will have to parse out those injuries he or she could have sustained even if a safer alternative design was used, while also explaining how the subject vehicle's defective design enhanced his or her injuries in the

underlying accident. *See Pennsylvania Dept. of General Services*, 898 A.2d at 601. These "particularized elements" are distinct to the crashworthiness doctrine and impose a burden of proof far and above that of a typical Section 402A action. *Id.*

Appellees herein pursued a crashworthiness case from its inception. In their complaint, Appellees described the factual basis for the instant action. In so doing, Appellees invoked the crashworthiness doctrine because they did not allege that a design defect within the Mitsubishi 3000GT caused the accident. Instead, they challenged the "design and manufacturing" of the "subject vehicle's **restraint system**" because of how it operated "**[d]uring** the rollover sequence." Appellees' Fourth Amended Complaint, 7/5/19, at 7-8 (numbering omitted) (emphasis added); *see Kupetz*, *supra*. Appellees alleged:

> On November 11, 2017, at approximately 1:58 p.m., the subject vehicle was being driven by [Mr.] Amagasu on Pineville Road, eastbound, in Buckingham Township, Pennsylvania.
>
> [Mr.] Amagasu was wearing his seatbelt.
>
> ***
>
> As the subject vehicle attempted to maneuver around another vehicle, it lost control, left the roadway and subsequently rolled over.
>
> **The loss of control was caused by the negligent maintenance, repairs, and inspections performed by [other defendants].**
>
> **During the rollover sequence, design and manufacturing defects in the subject vehicle's restraint system . . . caused**

> **[Mr.] Amagasu injuriously becoming partially ejected and/or interacting with the roof and/or other vehicle structures.**
>
> As a result, [Mr.] Amagasu suffered catastrophic injuries resulting in quadriplegia, paralysis, an inability to care for himself, as well as significant and ongoing conscious pain and suffering.

Appellees' Fourth Amended Complaint, 7/5/19, at 7-8 (numbering omitted) (emphasis added). Per Appellees' allegations, Mr. Amagasu's car accident occurred when he lost control of his vehicle, which Appellees claimed was the result of the negligence of other parties, not Appellant. Appellees did not maintain, therefore, that the design defects within the Mitsubishi 3000GT caused Mr. Amagasu to lose control of his vehicle. Instead, Appellees invoked the crashworthiness doctrine by alleging that the defects in the design of the Mitsubishi 3000GT's caused Mr. Amagasu to sustain enhanced injuries after he lost control of the vehicle.

In addition, the specific allegations lodged in Appellees' complaint further invoked the crashworthiness doctrine because, in each averment, Appellees claimed that the subject vehicle, as designed by Appellants, was defective in that it failed to adequately protect occupants during a crash sequence. Appellees, who never claimed that a design defect or inadequate warning led to the accident which lay at the heart of this case, alleged, in relevant part, as follows:

> a) The subject vehicle was defective and unreasonably dangerous because it was neither designed, manufactured, tested, assembled, marketed, distributed, and/or sold with a roof and related vehicle structures that were adequately

strong and would prevent, resist, and/or protect against significant crush and intrusion into the occupant survival space **during an accident and/or rollover, including the subject incident**;

b) The subject vehicle was defective and unreasonably dangerous because it was neither designed, manufactured, tested, assembled, marketed, distributed, and/or sold with a proper restraint system with a safe seatbelt that would adequately protect and/or restrain its occupants (including preventing partial ejection and/or impact with the roof and other vehicle structures), **during an accident and/or rollover, including the subject crash**;

c) The subject vehicle was defective and unreasonably dangerous because it was neither designed, manufactured, tested, assembled, marketed, distributed, and/or sold with a proper restraint system that would limit excessive head and/or body excursion and/or partial ejection of its occupants **during an accident and/or rollover, including the subject incident**;

d) The subject vehicle was defective and unreasonably dangerous because it was neither designed, manufactured, tested, assembled, marketed, distributed, and/or sold in a way that could withstand ordinary and foreseeable damage, including but not limited to damage to its roof and related structures, **during an accident and/or rollover, including the subject incident**;

e) The subject vehicle was defective and unreasonably dangerous because it was neither designed, manufactured, tested, assembled, marketed, distributed, and/or sold in a way that would adequately protect the vehicle's occupants **during an accident and/or rollover, including the subject incident including**, but not limited to occupants sitting in the driver's seat;

f) The subject vehicle was defective and unreasonably dangerous because it was neither designed, manufactured, tested, assembled, marketed, distributed, and/or sold with

seats that could withstand ordinary and foreseeable damage **during an accident or rollover, including but not limited to the subject incident**;

\*\*\*

i) The subject vehicle was generally defective and unreasonably dangerous in its design, manufacture, testing, assembly, marketing, distribution, and or sale because it failed to provide adequate protection **when being operated** as advertised and marketed and was furnished without adequate warnings; and

j) The subject vehicle was defective and unreasonably dangerous due to the inadequacy or absence of warning stickers, placards, or any proper documentation, or notice to alert users regarding the hazardous conditions, as stated above, including the lack of any adequate warnings sent to Plaintiffs despite Mitsubishi Defendants being aware that the vehicle was registered to a Pennsylvania resident.

*See id.* at 10-11 (some emphasis added and some emphasis in original). Appellees' complaint repeatedly contemplated recovery under the crashworthiness doctrine because Appellees consistently challenged how alleged defects within the Mitsubishi 3000GT operated during an accident; Appellees never asserted that an alleged defect caused Mr. Amagasu's accident.

Appellees' pre-trial filings were consistent with their amended complaint. For example, in Appellees' response to one of Appellant's motions *in limine*, Appellees admitted that this instant matter presented a "classic" crashworthiness case. Appellees' Response in Opposition of Appellant's Motion *In Limine*, 10/13/23, at 2. In particular, Appellees stated:

> **[T]he immediate case is a classic crashworthiness case** wherein liability is predicated on how a certain product/aspect/component part of a vehicle preformed **during** a crash sequence[] and not, conversely, how the vehicle got **into** the crash sequence.

*Id.* (some emphasis added and some emphasis in original).  Hence, it is readily apparent that, starting with the allegations within their complaint and then maintained in their pre-trial filings, Appellees sought to recover against Appellant under the crashworthiness doctrine.

Appellees continued to pursue a crashworthiness case at trial.  Indeed, consistent with their pre-trial pleadings and filings, Appellees did not, in any way, argue or present evidence that the alleged defects within the Mitsubishi 3000GT caused the underlying accident.  Instead, they focused upon the role the alleged defects, *i.e.*, the occupant restraint system and roof configuration, played during Mr. Amagasu's car accident.  In Appellees' counsel's opening statement, he set forth the relevant theory of the case as follows: "We believe that a seat belt that rips itself apart immediately before a rollover incident, in the moment that you need it the most, is defective."  N.T. Trial, 10/20/23 (Morning Session), at 48.  In addition, counsel stated:

> A restrained occupant should remain restrained in a rollover.  [Mr. Amagasu's] seatbelt, by design, failed to keep him restrained throughout his entire crash sequence.  Mitsubishi's seatbelt failed to deliver on the very same guarantee that Mitsubishi put in its manual, that the seatbelt would work to prevent injury, not cause it.  Mitsubishi used safety to sell their cars, Mitsubishi used safety to sell the 3000GT that [Mr. Amagasu] was in that day, but Mitsubishi did not provide on that safety that they used to line their corporate pockets with.

*Id.* at 56-57. From the outset of trial, Appellees pursued recovery under the crashworthiness doctrine because counsel did not contend that any defect within the Mitsubishi 3000GT caused Mr. Amagasu's car accident.

Appellees' counsel's claims during his opening statement were amplified and explained by Appellees' various experts at trial, all of whom uniformly assumed that the alleged defects with the Mitsubishi 3000GT, *i.e.*, the occupant restraint system and roof configuration, did not cause Mr. Amagasu's car accident. First, Mickey Gilbert testified regarding the sequence of events leading to Mr. Amagasu's car accident. He explained that Mr. Amagasu was traveling northbound at approximately 45 miles per hour on Pineville Road in Bucks County, Pennsylvania, when he "attempt[ed] to pass [the vehicle in front of him] on the left [side] in the oncoming lane." N.T. Trial, 10/24/23 (Morning Session), at 32. At this time, Mr. Amagasu's vehicle "went out of control, causing it to rotate clockwise . . . onto the left-hand shoulder, where it impacted a steep berm." *Id.* at 33. Thereafter, Mr. Gilbert explained that the "vehicle partially rolled over to the passenger's side and impacted a tree primarily with its hood." *Id.* This "impact with the tree" then "reversed the roll direction," causing Mr. Amagasu's "vehicle [to roll] back onto its wheels and [ultimately] came to rest in the oncoming lane." *Id.* Hence, Mr. Gilbert specifically testified that the underlying car accident occurred when Mr. Amagasu lost control of his vehicle. Mr. Gilbert did not offer any testimony suggesting that a defect in the occupant restraint system or roof configuration caused the accident.

Mr. Gilbert's expert testimony aligned with that offered by Appellees' other experts, Larry Sicher and Ronald Fijalkowski, Ph.D. Neither expert testified that the alleged defects within the Mitsubishi 3000GT caused the underlying accident. While using a demonstrative aid, Mr. Sicher explained the sequence of events leading to Mr. Amagasu's injuries as follows:

> So this is basically trying to give you an overview of the camera in the back of the car watching it forward. And you're seeing how he went off the road, hit that first embankment tree and starts this quarter tip to the right to the passenger's side. This is slowed down during what we call the tree impact at the end here. And what you see is his butt is able to come off the seat a little bit and his head [is] able to come forward. Because, again, the rip stitching has allowed the forces of slack into the system, so now his whole body is able to move further than you expect it normally. And that puts—this is what allows his head to [hit the roof of the vehicle].

N.T. Trial, 10/20/23 (Afternoon Session), at 60. Dr. Fijalkowski offered a similar opinion, stating:

> So, again, everything starts at the first impact, as Mr. Sicher described to you guys, two things happened. The frontal airbag deploys and [Mr. Amagasu's] belt rips entirely apart. So now you have that belt being useless and you're introducing at least [four] inches of slack into that system, allowing [Mr. Amagasu] to interact with the vehicle interior as it goes into that trip and subsequent quarter roll where the hood, not the survival space, interacts with the tree.

N.T. Trial, 10/23/23 (Afternoon Session), at 35. Arguments made by Appellees' counsel, as well as testimony from Appellees' expert witnesses, depict a classic crashworthiness case because no allegation or testimony

- 29 -

attempted to establish that alleged defects within the Mitsubishi 3000GT caused the underlying accident.

At trial, the parties presented evidence highlighting their dispute over key elements of the crashworthiness doctrine.  In their case in chief, Appellees presented evidence that a safer alternative design practicable under the circumstances existed at the time the Mitsubishi 3000GT was created and that, if Mitsubishi employed the safer alternative design, Mr. Amagasu would not have sustained his catastrophic injury.  This type of evidence is entirely consistent with and, as established above, specifically required under the crashworthiness doctrine.  Appellees' expert, Mr. Sicher, explained Appellees safer alternative design as follows.

> Q. Did you in your work as an expert in occupant restraint systems and design determine if there was a safer alternative design that could have been used in 1992?
>
> A. Yes.
>
> Q. Did you determine there was one?
>
> A. Yes.
>
> Q. What is the safer alternative design that you propose?
>
> A. Well, there's probably more than one.  But one that we analyzed eliminated the web loop and lowered the seat.  And therefore, we got more – Mr. Amagasu would have more head clearance in that car.
>
> Q. Was it possible in 1992 to lower the seat in a 3000GT?
>
> A. Yes.

Q. You've seen the criticism from Mitsubishi that when you lowered the seat, you didn't look at things like consumer comfort and visibility, things like this?

A. Yes.

Q. What do you have to say to those criticisms?

A. Well, first and foremost to me you need to make sure that your design is safe. And you're going to look at the elements for visibility. And that's all part of the analysis. But if you know you don't have enough head clearance to begin with, that's not a safe design right there. So you don't want to go any further.

Mitsubishi made sure they had good visibility, apparently, but they hadn't gone through and made sure it was safe in foreseeable rollover crashes.

Q. When you lowered the seat, how did you do it?

A. Well, two items we did. One is this is a height adjustable seat. It's a motorized seat. And it was set about mid position. It has an inch and a half of movement. So we lowered it from mid to lower. So we gained about three quarters of an inch. And we took out a little over two inches of foam that was sitting underneath of – between the bottom structures and where you sit. There was a little over [two] inches of foam; we took that out.

***

Q. How much total clearance would Mr. Amagasu had had in your redesign configuration?

A. Vertical clearance, we got him – he had [five] inches of clearance.

Q. Instead of [three], he gets [five] in your new design?

A. Correct.

N.T. Trial, 10/20/23 (Afternoon Session), at 81-83.

Thereafter, Mr. Sicher claimed that, if the Mitsubishi 3000GT implemented the alleged safer alternative design, Mr. Amagasu's head would not have struck the Mitsubishi 3000GT's roof during the accident, preventing his quadriplegia.  Mr. Sicher stated:

> Q. In your safer alternative design, does a combination of removing the web loop and lowering the seat prevent Mr. Amagasu's head from striking in the foreseeable rollover collision causing these types of injures?
>
> ***
>
> A. Yes.
>
> Q. How do you know that?
>
> A. Because there's other testing that shows that with that clearance and with rollovers that you're not going to get a head injury or neck injury.

*Id.* at 83-85.  Dr. Fijalkowski later echoed Mr. Sicher's opinion.  He testified:

> Q. No rip stitching, adequate headroom, equals no serious injury. Explain your [opinion] here, please.
>
> A. It's that simple, guys, right?  So if you're able to remove that rip stitching, okay, any interaction with the roof is likely going to be much reduced in terms of the forces applied.  Okay.  And then if you provide adequate headroom, there is no roof contact, right? Head doesn't strike a vehicle in – or a portion of the vehicle inside. That's the whole point of occupant protection and biomechanics, prevent that secondary impact.  We didn't in this case, and unfortunately, [Mr. Amagasu] had to suffer a very severe injury as a result.

N.T. Trial, 10/23/23 (Afternoon Session), at 48.  Thus, Appellees presented expert testimony purporting to establish both a safer alternative design, as

well as their contention that, had such features been employed in the Mitsubishi 3000GT, they would have prevented Mr. Amagasu's quadriplegia: the injury for which they sought compensation.

Finally, Appellees proffered expert testimony to support their claim that the defects in the Mitsubishi 3000GT, *i.e.*, the occupant restraint system and its roof configuration, enhanced Mr. Amagasu's injury. More specifically, Dr. Fijalkowski testified that, after the initial impact, the occupant restraint system's web loop deployed or "rip[ped] entirely apart" and, as such, Mr. Amagasu was virtually unrestrained during the remainder of the crash sequence. *Id.* at 35. This, per Mr. Sicher, allowed Mr. Amagasu's "head and body [to] pile drive into the roof" of the vehicle, ultimately causing Mr. Amagasu's catastrophic injury. N.T. Trial, 10/20/23 (Afternoon Session), at 31. While using a demonstrative aid, Mr. Sicher explained the sequence of events leading up to Mr. Amagasu's injury as follows:

> So this is basically trying to give you an overview of the camera in the back of the car watching it forward. And you're seeing how he went off the road, hit that first embankment tree and starts this quarter tip to the right to the passenger's side. This is slowed down during what we call the tree impact at the end here. And what you see is his butt is able to come off the seat a little bit and his head [is] able to come forward. Because, again, the rip stitching has allowed the forces of slack into the system, so now his whole body is able to move further than you expect it normally. And that puts—this is what allows his head to get up in [hit the roof of the vehicle].

***Id.*** at 60. Dr. Fijalkowski offered a similar opinion. ***See*** N.T. Trial, 10/23/23 (Afternoon Session), at 35; ***see also***, ***supra***, at 29. Thus, both Mr. Sicher and Dr. Fijalkowski opined that, because the occupant restraint system's web loop, as designed, ripped apart during the first impact, and because the Mitsubishi 3000GT's roof did not provide proper head clearance, Mr. Amagasu's head struck the roof, causing his quadriplegia. ***See*** N.T. Trial, 10/23/23 (Afternoon Session), at 44 (Dr. Fijalkowski opining: "The ripping of [Mr. Amagasu's] seat [belt] and lack of proper head clearance [in the Mitsubishi 3000GT] caused his injury."); ***see also*** N.T. Trial, 10/20/23 (Afternoon Session), at 59 (Mr. Sicher testifying: "Mr. Amagasu sustained a paralyzing cervical injury due to the defective design of the occupant restraint system, including the seat [belt] and head clearance.")

After Appellees' case-in-chief, Appellant presented various expert witnesses who disputed Appellees' claims, largely along the lines of evidentiary elements pertaining to the crashworthiness doctrine. More specifically, Appellant presented evidence that, even if the alleged safer alternative design was used, the crash was so severe that Mr. Amagasu's head would have struck the roof regardless, rendering him a quadriplegic. In this same vein, Appellant's various experts testified that the fact that the web loop deployed during the accident did not cause or contribute to Mr. Amagasu's ultimate injury. Appellant's witness, Roger Winn Nightengale. Ph.D., testified as follows:

So these are my core opinions in this case, based on what I reviewed. Mr. Amagasu was in a complex, high energy crash. I think that's obvious. He had an axial compressive injury to his neck. And we'll talk a little bit more about what that means. His head was on the roof of the vehicle prior to the final tree impact. I don't think there's any contention about that. In my opinion, the deployment of the web loop was not required to get this injury. And the fact that it was deployed played no role in this. At the time of the tree impact, Mr. Amagasu's head was stopped against the roof and his neck had to manage the energy, the kinetic energy of his moving torso. And I'm in agreement with Dr. Fijalkowski on that. The amount of compression required to produce this injury is between one-half and three-quarters inches. And we'll talk more about that basis, too. But basically you can't compress the neck more than half-an-inch without it breaking. And I'm not aware of any commercially viable restraint that could have prevented Mr. Amagasu's contact with the roof in this crash and prevented his injury.

N.T. Trial, 10/26/23 (Morning Session), at 102-103.

In addition, Dr. Nightengale presented evidence of surrogate study conducted in preparation of trial. He explained the reason for conducting this study as follows:

Well, my understanding from Dr. Fijalkowski's report was that they believed that Mr. Amagasu could not have [come into contact with the roof of the vehicle] without the deployment of th[e web loop in the occupant restraint system], without that extra [four] inches of webbing from the energy-absorbing loop. So we did the study to assess whether or not that was true.

N.T. Trial, 10/26/23 (Afternoon Session), at 21. Then, Dr. Nightengale testified that, after conducting this study, the surrogate's head still encountered the vehicle's roof even when the occupant restraint system's web

loop did not deploy. *Id.* at 28-29. Based upon the foregoing, Dr. Nightengale opined that the "[d]eployment of the web loop [in the occupant restraint system was] not required to [for Mr. Amagasu] to get this injury." *Id.* at 65-66.

In addition, another one of Appellant's experts, William Walker VanArsdale, Ph.D., affirmed Dr. Nightengale's opinion. In particular, Appellant's counsel asked Dr. VanArsdale whether "a different design [would have] prevented [Mr. Amagasu's] injury?" N.T. Trial, 10/26/23 (Afternoon Session), at 114. He stated:

> I do not believe there is an alternative design, a different design, that would have prevented this injury or prevented this forceful contact with the roof structure[.]

*Id.* The expert testimony and evidence presented by Appellant's at trial, therefore, placed the elements of the crashworthiness doctrine in controversy.

The foregoing establishes that, at trial, it was undisputed by the parties that the alleged defects in the Mitsubishi 3000GT, *i.e.*, the occupant restraint system and its roof configuration, did not cause Mr. Amagasu to get into the instant car accident. Instead, the evidence and testimony presented at trial revolved around Appellees' contention that defects within the Mitsubishi 3000GT "served to increase the injury [Mr. Amagasu] suffered **during** the accident." *Colville*, 809 A.2d at 923 (emphasis added). This allegation directly speaks to the crashworthiness doctrine and, in fact, renders a traditional Section 402A claim inapplicable. *See id.* at 922 ("Historically, a

Section 402A strict products liability action only create[s] liability for injuries proximately caused by a defect where the defect also caused the accident."); *see also Raskin*, 837 A.2d at 523 (accord).

Moreover, the parties, through various expert testimony, specifically disputed virtually all of the elements of the crashworthiness doctrine. Appellees experts, namely, Mr. Sicher and Dr. Fijalkowski, contended that if Mitsubishi employed an occupant restraint system without a web loop and designed the vehicle with additional head clearance, this would have prevented Mr. Amagasu's head from hitting the roof of the vehicle during the accident and, as such, his quadriplegia. In this same vein, both Mr. Sicher and Dr. Fijalkowski opined that the deployment of the web loop and the lack of head clearance in the vehicle caused Mr. Amagasu's life-threatening injury.

Appellant, however, presented expert testimony and evidence disputing Appellees' claim. In particular, Dr. Nightengale contended that, because the instant car accident was so severe, Mr. Amagasu's head would have contacted the vehicle's roof even if the web loop did not deploy. In addition, Dr. VanArsdale disputed Mr. Sicher and Dr. Fijalkowski's claims that a safer alternative design could have prevented Mr. Amagasu's quadriplegia. We therefore agree with Appellant's contention that the evidence presented at trial spoke directly to the crashworthiness doctrine. As such, "a charge on the theory . . . [was] warranted." *Tincher*, 104 A.3d at 408.

Importantly, our Court's precedent makes clear that, where there is disputed evidence about a legal issue, as in this case, the trial court "must

clarify issues so that the jurors may comprehend the questions they are to resolve, elucidate correct principles of law applicable to the pending case, and endeavor to make those principles [understandable] in plain language." ***Commonwealth v. Clark***, 683 A.2d 901, 904 (Pa. Super. 1996). Indeed, this Court addressed this exact issue in ***Colville***, the facts of which are as follows. In October 1994, the plaintiff, David Colville, injured his left foot while operating a "Crown RR3020-45 standup forklift during the scope of his employment at Hechinger's, a building supply store in Philadelphia[, Pennsylvania]. ***Colville***, 809 A.2d at 920. More specifically,

> [w]hile [Mr. Colville] attempt[ed] to unload a delivery truck, [he] lost control of the forklift and slammed into the truck. During this accident, [Mr.] Colville's foot was expelled from the operator's compartment and was crushed between the wheel of the delivery truck and the base of the forklift.

***Id.*** Thereafter, Mr. Colville pursued a strict products liability action against the forklift's manufacturer, Crown Equipment Corporation, as well as the seller of the forklift, Omnilift, Inc. (hereinafter, the "Forklift Defendants"). In the complaint, Mr. Colville alleged "that the forklift was defective because it was designed and manufactured without a door enclosing the operator's compartment and did not provide certain warnings." ***Id.*** At the close of the jury trial, the trial court held a charge conference during which the Forklift Defendants asked the trial court to issue a jury instruction explaining the elements of the crashworthiness doctrine because, in their view, such an instruction was warranted given the fact that Mr. Colville "invoked the theory

during [] opening statement[s] and throughout [his] case and chief." *Id.* The trial court denied the Forklift Defendants' request and, instead, instructed the jury "on the elements of a traditional Section 402A strict products liability claim." *Id.* Ultimately, the jury returned a verdict in Colville's favor and awarded significant damages.

The Forklift Defendants appealed. Initially, the Forklift Defendants argued that the crashworthiness doctrine applied to the case because Mr. Colville did not allege that the absence of the door on the operator's compartment forklift caused him to crash into the delivery truck. Instead, Mr. Colville alleged "that the absence of a door [] increased or enhanced the severity of the injury incident to the accident." *Id.* at 922. Based upon the foregoing, the Forklift Defendants claimed that a "jury charge on crashworthiness was necessary." *Id.* Accordingly, the Forklift Defendants argued that the trial court's failure to issue a jury instruction explaining the elements of the crashworthiness doctrine required a new trial. This Court agreed.

At the outset, this Court recognized that the crashworthiness doctrine is a "subset of a Section 402A products liability action" and "is uniquely tailored to address those situations where the defective product did not cause the accident but served to increase the injury." *Id.* at 925-926 (citation omitted). Then, the **Colville** Court reviewed the evidence presented at trial and determined that Mr. Colville "consistently introduced evidence indicating the absence of the door did not cause the initial impact" and, instead, "presented

evidence that the defect [(*i.e.*, the absence of a door in the operator's compartment)], served to [enhance the injuries Mr. Colville sustained] during the accident." ***Id.*** at 923. As such, the ***Colville*** Court determined that "an instruction on crashworthiness was required" and the trial court's failure to issue such an instruction constituted an error of law. ***Id.*** at 926.

The ***Colville*** Court then went on to determine whether the trial court's error prejudiced the Forklift Defendants and, in turn, necessitated a new trial. Ultimately, the Court determined a new trial was warranted. In reaching this conclusion, ***Colville*** recognized that the jury did not receive any instruction on the crashworthiness doctrine. ***See id.*** at 927 ("In the instant case, the jury was instructed on the elements of a Section 402A strict products liability claim without any reference to the crashworthiness standard."). Hence, the "jury returned [its] verdict [based] upon its determination that [Mr. Colville] proved each of the elements under a Section 402A claim by a preponderance of the evidence," not based upon the crashworthiness doctrine which "imposes more rigorous proof requirements than the typical Section 402A claim." ***Id.*** Accordingly, this Court found that the trial court's failure to "hold [Mr. Colville] to this burden" caused the Forklift Defendants to "certainly suffer prejudice" and subsequently vacated the judgment and remanded for a new trial. ***Id.***

This matter is virtually indistinguishable from **Colville**.[9]  As we have established, it was undisputed by the parties that the claimed defects inherent to Mitsubishi 3000GT did not cause Mr. Amagasu to lose control of the vehicle or to get into an accident.  Instead, both parties presented expert testimony disputing, first, that the alleged safer alternative design as set forth by Appellees' expert witness, Mr. Sicher, could have operated to prevent Mr. Amagasu's injuries.  In addition,  both parties' experts disputed whether the defects within Mitsubishi 3000GT, *i.e.*, the occupant restraint system and its roof configuration, worked to enhance the injury Mr. Amagasu sustained during the accident.  Here, as in **Colville**, the evidence and testimony set forth by both parties at trial related to the crashworthiness doctrine.  Our precedent, therefore, demands a jury instruction on this basis.

Even though a court is required to "instruct the jury on the correct legal principles applicable to the facts presented at trial," the trial court in this instance abdicated its duty to do so.  **Gaudio v. Ford Motor Co.**, 976 A.2d 524, 550 (Pa. Super. 2009).  Indeed, at the charge conference in this matter, Appellant objected to Appellees' proposed jury instructions on the issue of strict liability, citing the fact that "none of the[] instructions . . . contain the crashworthiness elements that were a part of [the] case."  N.T. Trial, 10/27/23 (Morning Session), at 82.  Appellees, however, argued that the trial court

---

[9] We are bound by **Colville**.  **See Regis Insurance Co. v. All American Rathskeller, Inc.**, 976 A.2d 1157, 1161 n. 6 (Pa. Super. 2009) (explaining that a Superior Court panel lacked power to disregard and overrule a binding prior decision).

should not provide "anything other than the suggested standard civil jury instructions," which do not include an instruction on the crashworthiness doctrine. *Id.* at 85. Ultimately, the trial court elected to stick to its "normal policy" of "not includ[ing] proposed instructions" absent an agreement between the parties "unless . . . [the court had] some extended knowledge that [the proposed instruction was] necessary." N.T. Trial, 10/26/23 (Afternoon Session), at 123. In explaining its reasoning for denying Appellant's request for a jury instruction on the crashworthiness doctrine, the trial court stated:

> I am not going to adopt or read [Appellant's] proposed instructions, as I typically do not do that unless there [is] an agreement. There is no agreement here.

N.T. Trial, 10/27/23 (Morning Session), at 86. The trial court's decision, therefore, was not a logical and dispassionate determination based upon its review of pertinent case law or the evidence presented at trial. To the contrary, the trial court seemingly declined to provide a jury instruction on the elements of the crashworthiness doctrine because the topic was not included in the Pennsylvania Suggested Standard Civil Jury Instructions. In so doing, the trial court essentially outsourced its discretion to a secondary legal source that this Court has held is "not conclusive, but [] merely a guide." *Clark*, 683 A.2d at 907. In this same vein, the trial court, by mandating the parties agree before issuing a non-standard jury instruction, all but provided Appellees, as the party resisting the application of the crashworthiness doctrine, ultimate

veto power, which they would almost certainly exercise given the doctrine's rigorous proof requirements. We readily conclude that the trial court's decision process was "manifestly unreasonable" and/or "the result of partiality, prejudice, bias or ill will." *Hangey v. Husqvarna Pro. Prods., Inc.*, 304 A.3d 1120, 1141 (Pa. 2023) (citation omitted). Thus, we are constrained to vacate the judgment of the trial court and remand for a new trial.

Before we conclude, however, we briefly address certain matters raised on appeal by Appellees to support their contention that the trial court did not issue erroneous jury instructions in the instant matter. First, Appellees argue that a jury instruction on crashworthiness was not necessary because, in contrast to Appellant's claim, Appellees were not required to "pursue a strict liability claim sounding in design effect under the rubric of crashworthiness." Appellees' Brief at 18. Second, Appellees contend, "[w]hile the trial court declined to give [Appellant's proposed] instructions verbatim," the trial court's jury instructions incorporated their "substance" which, in Appellees view, was sufficient. *Id.* at 44. We will address each of these claims in turn.

We first address Appellees' claim that a jury instruction on crashworthiness was unnecessary because they were entitled to pursue liability under a traditional Section 402A strict liability theory. Importantly, we note that this exact claim was raised and rejected by this Court in *Colville*. *See Colville*, 809 A.2d at 925 (rejecting the appellees' claim that "crashworthiness [was] an additional theory recovery that a plaintiff may elect

to pursue"). A traditional Section 402A strict liability case is only available to those who maintain that a defect "proximately causes both the accident and the injuries sustained during the accident." *Id.* The crashworthiness doctrine, on the other hand, is a "subset of a Section 402A claim" and, thus, is "uniquely tailored to address those situations where[, like here,] the defect product did not cause the accident but served to increase the injury." *Id.* (citation omitted). As we have established, Appellees never maintained that the defects in the Mitsubishi 3000GT caused Mr. Amagasu's accident. Hence, Appellees were unable to pursue a typical Section 402A claim.

Moreover, and in contrast to Appellees' claims, our Supreme Court's decision in *Tincher*, *supra,* did not alter this fact. *See* Appellees' Brief at 18-19 (arguing that in *Tincher*, our Supreme Court "rejected the concept of product-specific design defect theories, holding instead that the consumer expectation/risk-utility approaches adopted in that case would apply across-the-board in strict liability claims sounding in design defect without regard for product or fact-pattern"). In *Tincher*, our Supreme Court established that, when pursuing a traditional strict liability claim rooted in allegation of a defective design, a plaintiff may show a defective condition by demonstrating either that "(1) the danger is unknowable and unacceptable to the average or ordinary consumer [(a.k.a., consumer expectation test)], or that (2) a reasonable person would conclude that the probability and seriousness of harm caused by the product outweighed the burden of costs or taking precautions [(a.k.a., risk-utility test)]." *Tincher*, 104 A.3d at 335. The

Court further held that whether a product is defective is a question of fact and, as such, must be submitted to a jury, except in instances where it is clear that reasonable minds could not differ. *Id.* It did not, in any way, abrogate the crashworthiness doctrine.[10] Instead, it clarified the method by which a plaintiff may go about proving the first element of the crashworthiness doctrine, *i.e.*, "the design of the vehicle was **defective**." *Colville*, 809 A.2d at 922 (emphasis added). [11] Simply put, *Tincher* did not involve a crashworthiness case and Appellees' claim to the contrary is specious, at best.

_____

[10] The crashworthiness doctrine is hardly mentioned in *Tincher*. It is only mentioned in the Supreme Court's recitation of the procedural history because the appellant, Omega Flex, attempted to obtain post-trial relief by claiming that the appellees, Terrance and Judith Tincher "had not met their burden of proof under the so-called 'fireworthiness' doctrine," which Omega Flex claimed "was a Third-Restatement-like approach similar to the more familiar 'crashworthiness' exception to the Second Restatement." *Id.* at 318. Similarly, Omega Flex contended that the trial court erred in failing to give a jury instruction on this basis. *Id.* The trial court rejected Omega Flex's contention that "a 'fireworthiness' instruction – as an extension of the 'crashworthiness' doctrine, requiring 'a more rigorous standard of proof than the usual [Second Restatement] claim' was appropriate because [the product] had been employed for its intended use" and the Tinchers' "case did not relate to how [the product] preformed **during** the fire . . . rather, the defect in [the product] they pursued was the proximate cause of the Tinchers' injuries." *Id.* at 321 (emphasis added). Our Supreme Court did not address this claim. Instead, it confined its review to Omega Flex's request for it to "replace the strict liability analysis of Section 402A of the Second Restatement with the analysis of the Third Restatement." *Id.* at 323.

[11] As we discussed *supra*, a plaintiff may prove the existence of a design defect by way of the risk-utility, consumer-expectations and/or failure-to-warn theories. These three methods of proving design defects are, much like the formulation for proving causation, available in all cases regardless of whether the theory of recovery is asserted under Section 402A

*(Footnote Continued Next Page)*

In addition, we reject Appellees' contention that, although the trial court did not adopt Appellant's proposed jury instructions, the substance thereof sufficiently covered the crashworthiness doctrine. In particular, Appellees claim that the overall "concepts" conveyed by the trial court, as well as the "alternative design question on the verdict slip" were sufficient. Appellees' Brief at 28. We disagree.

"[J]ury instructions are the principal medium for communicating to the jury the legal basis upon which its verdict is to rest." **Clark**, 683 A.2d at 904. The "jury is required to rely upon the oral instructions given by the judge in his [or her] charge." **Commonwealth v. Duffey**, 889 A.2d 56, 70 (Pa. 2000). If erroneous instructions are provided and, as such, a "jury is left to its own devices," the "possibility of a misconception is significantly enhanced." **Id.** The certified record reveals that the trial court herein did not provide the jury with any instruction whatsoever on crashworthiness. **Compare Colville**,

_____

or the crashworthiness doctrine. Proof of a defective design, however, is only part of the first element of the crashworthiness doctrine (it also requires proof of a safer alternative design). Indeed, what separates the crashworthiness doctrine from a conventional claim under Section 402A is that, unlike a typical action brought under Section 402A where proof of defect and causation are the focus of litigation, the plaintiff in a crashworthiness case must prove more than a defective design and causation. In a crashworthiness case, the second element of proof demands that the plaintiff specify which injuries he or she would have sustained if a safer alternative design was used. The third element in a crashworthiness case requires that the plaintiff show the injuries for which compensation is sought were caused by an alleged defect in product design. As explained above, crashworthiness is a more rigorous theory for the plaintiff because it requires proof that a safer design would have prevented a compensable injury and proof that a defect, in fact, caused the compensable injury.

*supra*, at 927 (explaining that "the jury was instructed on the elements of a Section 402A strict products liability claim without any reference to the crashworthiness standard"); *with Gaudio*, *supra*, at 550-551 (explaining that, while the trial court's jury instructions were incomplete in some respects, the court "adequately described" the "specific elements of a crashworthiness claim"). Hence, the trial court failed to explain to the jury the applicable legal basis upon which they were asked to issue a verdict. Instead, the trial court allowed the jury to hold Appellant liable based solely upon their determination that Appellees "proved each of the elements under Section 402A claim by a preponderance of the evidence" which, as we have established, did not constitute minimally adequate guidance channeling the jury's factual assessments within the context of the legal principles presented in this case. *Colville*, 809 A.2d at 927.

Importantly, the mere presence of a question on a verdict slip regarding a safer alternative design cannot salvage a jury instruction that wholly failed to direct the jury on how to consider such evidence. *See Commonwealth v. Ali*, 10 A.3d 282, 311 (Pa. 2010) ("A verdict slip exists to record the result of the jury deliberation; it is not the deliberation itself, and the jury's deliberation is guided by the court's charge."). In its jury instructions, the trial court mentioned the term "safer alternative design" only when explaining the risk-utility test: a theory by which a jury may determine a product is defective. *See* N.T. Trial, 10/27/23, at 92 (explaining that, to determine whether Appellees established a design defect claim under the risk-utility test, the jury

- 47 -

may consider multiple factors, including "the feasibility of an alternative safer design at the time of the manufacture or sale of the occupant restraint system, the cost of an alternative design, and/or the disadvantages of an alternative design."). It is therefore unclear whether, when answering the question regarding a safer alternative design on the verdict slip, the jury answered in the affirmative because they simply considered the vehicle to be defective under the risk-utility test. Moreover, the jury was never asked to consider what injuries, if any, Mr. Amagasu could have sustained if a safer alternative design was used. In a crashworthiness case, the fact finder must consider whether the plaintiff bore his or her burden of specifically identifying the injury that a safer alternative design would have prevented, as well as the compensable injury that was ultimately caused by the alleged design defect. *See Pennsylvania Dept. of General Services,* 898 A.2d at 601 (explaining that the fact finder in a crashworthiness case must "distinguish non-compensable injury (namely, that which would have occurred in a vehicular accident in the absence of any product defect) from the enhanced and compensable harm resulting from the product defect."). Without a jury instruction directing the jury on exactly how to consider this evidence, the trial court failed to "educate [the jury] as the points of law" and how they were "to decide the case by **applying the court's instructions** to the evidence presented." *Clark*, 683 A.2d at 907 (emphasis added). We therefore reject Appellees' contention that the substance of the trial court's jury instructions –

which completely failed to provide any instructions on crashworthiness – were sufficient as a matter of law.

Based upon all of the foregoing, we vacate the judgment of the trial court and remand this matter for a new trial.

Judgment vacated and case remanded for a new trial. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/22/2025